Filed 9/16/15  P. v. Corona CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE, | B253732 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. VA 130409) |
| v. | |
| AUGUSTIN CORONA et al., | |
| Defendants and Appellants. | |

APPEAL from an order of the Superior Court of Los Angeles County, Roger Ito, Judge.  Affirmed.

Adrian K. Panton, under appointment by the Court of Appeal, for Defendant and Appellant Augustin Corona.

Richard M. Doctoroff, under appointment by the Court of Appeal, for Defendant and Appellant Manuel Perez Soto.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Scott A. Taryle and Kimberley J. Baker-Guillemet, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Augustin Corona and Manuel Perez Soto were convicted by a jury of three counts of second degree robbery. (Pen. Code, § 211.)[1] As to Corona, the jury found true the allegation in counts 2 and 3 that a principal was armed with a firearm within the meaning of section 12022, subdivision (a)(1). As to Soto, the jury found true the allegation in counts 2 and 3 that he personally used a firearm within the meaning of section 12022.53, subdivision (b). The court imposed sentences of five years as to Corona, and 15 years as to Soto.

On appeal, defendants seek reversal of the judgment, based on claimed prosecutorial misconduct during closing argument. Corona raises an additional claim of insufficient evidence. We conclude the contentions are not meritorious, and affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

On the night of May 29, 2013, a string of armed robberies occurred during a 30-minute period in the same general area. In each instance, a pedestrian was robbed by two Hispanic men in a gray SUV, one of whom had a gun and was wearing a bullet proof vest and a police badge.

The first victim, Donald Alvarado, was walking on Alameda Street at about 10:00 p.m. when "an older model S.U.V." pulled up. The front passenger jumped out. Alvarado thought the man was a police officer because he was wearing a police badge and vest, and was yelling "Police. Police." The man told Alvarado to "Freeze," placed a circular object against his back, and forced him to the ground. Alvarado did not see a weapon, but felt an object pressed against his back while his wallet, cell phone, and earphones were taken from him. By the time Alvarado realized the man was not a police officer and that he had been robbed, the S.U.V. "was already speeding down the street." Alvarado went home and called 911. Los Angeles Police Department officers responded to the call and took Alvarado's report.

---

[1] All further undesignated statutory references are to the Penal Code.

2

The second victim, Darryl Hopkins, was robbed about 10 or 15 minutes later near Florence and Central. During a 911 call made at 10:26 p.m., Hopkins reported being robbed by "two Mexican guys" with a "badge," who were acting like "police." A gun was put to his head, he was thrown against a car, and his wallet was taken. The men were heading west on Florence in a gray Explorer.

Los Angeles County Deputy Sheriffs Raul Guerrero and his partner responded to Hopkins's 911 call. As they were talking to Hopkins, they heard a broadcast of another robbery just two blocks away on Florence. Guerrero and his partner immediately responded to that call and met the third robbery victim, Hugo Rodas.

Rodas said he was walking down the street when a gray van pulled up. There were two men; one was wearing "a vest and a police badge" and had a gun. That man took his wallet and cell phone. Rodas provided a partial license plate number of the vehicle (5EW__21), which he had written on his hand.

A message was sent to sheriff's vehicles describing the suspects, their vehicle, and the partial license plate number. At 11:45 p.m., Sergeant Marcello Quintero spotted a vehicle matching that description near Central and Slauson. Deputies conducted a traffic stop of the vehicle—a gray Ford Escape with license plate number 5EWB931. Corona, the registered owner of the Escape, was in the driver's seat, and Soto was in the passenger's seat.

Guerrero arrived at the scene of the traffic stop as Corona and Soto were being led to another vehicle. While Corona and Soto were detained, Guerrero searched the Escape. Inside the vehicle, he found "three cell phones, a vest, a badge on the vest, [and a] loaded Ruger" 9 millimeter handgun. One of the cell phones was ringing. The caller was Alvarado's brother, who said, "'You robbed my brother. Where are you? Let me know where you are. I will get you.'" Guerrero explained that he was a police officer and asked that Alvarado be brought to Central and Slauson.

Alvarado arrived at the scene of the traffic stop and spoke with Guerrero. Alvarado identified the Escape, his cell phone, and his headphones, which were hanging on the rearview mirror of Corona's vehicle. Guerrero conducted a field identification,

3

during which Alvarado identified Corona as the driver, and Soto as the passenger who committed the robbery.

Guerrero brought Hopkins to Central and Slauson. Guerrero tried to locate Rodas in order to view the suspects and the vehicle, but he was not home. The next morning, Guerrero took Rodas to the tow yard to look at the vehicle. Rodas identified his cell phone, which was found in the vehicle.

At the preliminary hearing, all three victims identified defendants in court. Each victim identified Corona as the driver, and Soto as the man who committed the robbery.

Defendants' jury trial began on September 12, 2013. Hopkins was subpoenaed to appear in court, but did not appear. The prosecutor asked the court to issue a body attachment, but to wait until the following morning to enter it into the computer system. Hopkins did not appear at trial, and the body attachment was not entered into the system. The prosecution requested that Hopkins be declared unavailable as a witness. The trial court conducted a due diligence hearing. (Evid. Code, § 240, subd. (5) [declarant may be found unavailable as a witness if proponent exercised reasonable diligence in attempting to procure witness' attendance].) The evidence at the hearing showed that Hopkins was working in Las Vegas, but would return to Los Angeles on Wednesday, September 18. After concluding that the evidence did not demonstrate due diligence, the court declined to declare Hopkins unavailable as a witness.

Alvarado testified at trial, and identified both defendants in court. He testified that he was able to get a "good look" at Corona, the driver. He identified Soto as the passenger who jumped from the vehicle yelling, "Police. Police." He made field identifications of both defendants on the night of the robberies. His cell phone and ear phones were found in the vehicle and returned to him that night.

Rodas also testified at trial, and also identified both defendants in court. Rodas identified Corona as the driver, and Soto as the passenger who pointed a gun at his head.

4

Over a defense objection, the trial court allowed the prosecution to play a recording of Hopkins's 911 call, in which he described the suspects as "two Mexican guys" with a "badge," who were acting like "police."[2]

Guerrero and other law enforcement officers testified about the investigation, the traffic stop, the items recovered from the vehicle (loaded handgun, bullet proof vest, police badge), the registration of the vehicle and handgun to Corona, the close similarity between the license plate number provided by Rodas and the license plate of the Escape, and the discovery of Alvarado's ear phones and cell phones belonging to Alvarado and Rodas in Corona's vehicle.

Guerrero testified that when he met Hopkins immediately after the robbery had occurred, Hopkins was "shaken up," "scared," and in "disbelief of what just had happened." When Guerrero was asked to recount Hopkins's extrajudicial statements, the court sustained a hearsay objection. When the officer was asked if there was anything unique about the events described by Hopkins, the court sustained another hearsay objection, struck Guerrero's response ("That he assumed they were police officers."), and admonished the jury to disregard it.

During cross-examination of Guerrero, Corona's attorney raised the topic of field identifications made by Hopkins. Although there had been no evidence of a field identification made by Hopkins, Corona's attorney asked whether Hopkins was at "a

_____

[2] Outside the jury's presence, the court considered defense objections to admission of the 911 recording. Defendants argued the statements were testimonial hearsay, and because Hopkins was not a trial witness, the admission of the 911 recording would violate their constitutional right to confrontation (*Crawford v. Washington* (2004) 541 U.S. 36). After listening to the 911 recording and considering arguments of counsel, the trial court concluded the statements were not testimonial within the meaning of *Crawford*, and were admissible under the spontaneous statement exception to the hearsay rule (Evid. Code, § 1240). The trial court's ruling, which was based on *People v. Ledesma* (2006) 39 Cal.4th 641, 709, and *People v. Corella* (2004) 122 Cal.App.4th 461, 468–469, is not challenged on appeal.

5

distance of approximately 15 feet when he made that identification?"[3]  Corona's counsel also asked whether a spotlight was used to illuminate the individuals on display, whether Hopkins could see the suspects' vehicle during the field identification, and whether the suspects were referred to as the driver and passenger when they were shown to Hopkins. Corona's counsel also asked whether Alvarado was "present when *Mr. Hopkins made his identification*?"  (Italics added.)  No objections were raised to any of these questions.

Soto did not testify at trial.  Corona, who testified in his own defense, stated that he has a firearm license and works as a security guard at marijuana stores.  Corona admitted ownership of the gun, vest, and badge, which he kept in his vehicle.  On the night of the robberies, his vehicle was at Soto's house for repairs.  He went to Soto's house that night to retrieve his vehicle, but both his and Soto's cars were gone.  He waited about 30 minutes.  When Soto returned with Corona's car, they decided to go to a friend's house.  As they were driving to the friend's house, they were pulled over by police.  During the field identifications, someone yelled "Driver" each time Corona was

---

[3] "Q    Was Mr. Hopkins seated in your vehicle, or was he outside of your vehicle when he was asked to make an identification?
  "A    Outside.
  "Q    Was he standing up?  Was he sitting down?
  "A    He was outside and brought closer.
  "Q    How much closer?
  "A    Probably minus another 25 feet.
  "Q    So you said your car came to rest approximately 40 feet, so now you're saying he was brought 25 feet closer?
  "A    Yes.
  "Q    So then he was a distance of approximately 15 feet when he made that identification?
  "A    Give or so couple feet.
  "Q    That's of the individuals?
  "A    Yes.
  "Q    And when the individuals were being displayed to Mr. Hopkins, how was that done?
  "A    They were brought out separately.
  "Q    Were they in handcuffs?
  "A    I don't recall."

brought out for viewing. Corona denied robbing anyone, and also denied using his firearm or allowing anyone else to use it.

In her closing argument, the prosecutor referred to field identifications and the 911 call made by Hopkins: "We heard from Deputy Guerrero. He left the scene where the defendants' later [*sic*] been detained, and he went back and picked up Mr. Hopkins. He brought him back to examine Mr. Hopkins [*sic*], says defendant Soto had a gun, and yes, defendant Corona was in the car. He tells you that. [¶] So I believe you also–you can listen to Deputy Guerrero's testimony or probably took notes. He identified the car also. So again, same factors, same M.O., short distance from where Mr. Alvarado was robbed, short distance certainly from where Mr. Rodas was robbed with a gun to a head. As he stated, they put the gun in my head, and they threw me against the car using police tactics, or what he perceived to be police tactics. So that's what you heard from our three witnesses." No objections were made to these statements.

Later in her closing argument, the prosecutor again referred to field identifications: "We know when Alvarado gets there, he's read the admonition, he identifies both suspects, and he leaves, presumably to go back home, and then they go and get Mr. Hopkins. Guerrero tells you—Deputy Guerrero, they bring him to the scene. He makes his identification of both defendants after having read it. [¶] And then again Guerrero told you they couldn't find Mr. Rodas who had written the number down because he had just had no way to get ahold of him. They couldn't find him. They saw him later on in the early morning hours. That's when they took him to the tow yard, the station, returned his phone to him, and he said he helped in collecting the evidence and was present when it was all gathered up to get booked." No objections were made to these remarks.

Soto's attorney argued to the jury that there was no evidence that Hopkins had identified either defendant: "And the prosecutor, I believe she stated—again I don't want to misspeak because that's not my job. I don't want to misspeak. I don't want to do that. I believe she said that the deputy testified to the fact that Mr. Hopkins made an identification of the people in this case, and it's my understanding that he did not. [¶] But again, the court reporter's the best person to ask because my belief is that Mr. Hopkins

7

never made an identification of the person who robbed him, and in addition to that, he never came to court and testified before you of the person who robbed him."

In her rebuttal argument, the prosecutor used a "PowerPoint" presentation titled "UNLUCKY COINCIDENCE." Before the presentation began, defense counsel requested to preview the prosecutor's slides. She objected, and the court denied the request, stating that objections would be ruled on during the presentation. During the presentation, the trial court halted the presentation before slide number 12, which is the subject of the prosecutorial misconduct allegation, was shown to the jury.[4] Slide number 12 stated: "12. BOTH IDENTIFIED BY (V) HOPKINS."

Outside the jury's presence, the court said to the prosecutor, "I see on your list it says: Both identified by victim Hopkins." "There is no evidence of that. There was no evidence of . . . Hopkins identifying the defendants." When the prosecutor explained that Guerrero's field identification testimony "was brought out on cross," the court replied, "You argued that. That's hearsay. It's inadmissible." The prosecutor rejoined, "But it was in the record, Your Honor." The trial court stated, "Ms. Oehler, that is unreliable

---

[4] "1.    SUSPECT DESCRIPTIONS: 2MH  goatee  hair
"2.    GRAY SUV TYPE VEHICLE
"3.    IMPERSONATING POLICE OFFICERS
"4.    VEST + BADGE FOUND IN CAR
"5.    AT GUNPOINT
"6.    LOADED GUN FOUND IN CAR
"7.    PARTIAL PLATE: 5EW_ _21    vs.
        ACTUAL PLATE:  5EWB931
"8.    STOPPED NEAR CRIME LOCATIONS
"9.    GUN + BADGE + VEST BELONG TO
        DEF CORONA
"10.   SAME M.O. IN ALL 3 ROBBERIES
"11.   BOTH IDENTIFIED BY (V)ALVARADO
"12.   BOTH IDENTIFIED BY (V)HOPKINS
"13.   BOTH IDENTIFIED BY (V)RODAS
"14.   (V)ALVARADO'S CELL PHONE +
        HEADPHONES ARE IN THE CAR
"15.   (V)RODAS' CELL PHONE IN CAR

8

hearsay evidence. Do not argue that. Do not argue that. It is not part of the record." The prosecutor made no further reference to Hopkins in her remaining remarks to the jury.

The case was submitted to the jury, which spent less than a full day in deliberations. At 11:25 a.m., the jury sent a note stating: "3 jurors cannot reach a verdict on defendant Corona. Requesting copy of witness's statements." At 1:50 p.m., the jury clarified its request and sent a note stating that it was interested in Alvarado's testimony regarding his description of the driver. After that portion of Alvarado's testimony was read to the jury, it resumed deliberations. The jury returned its verdict at 3:30 p.m. that day.

Defendants were convicted on all three robbery counts. As to Corona, the jury sustained the allegation in counts 2 (robbery of Rodas) and 3 (robbery of Hopkins) that a principal was armed. (§ 12022, subd. (a).) As to Soto, the jury sustained the allegations in counts 2 and 3 that he personally used a firearm. (§ 12022.53, subd. (b).)

Defendants moved for new trial based on prosecutorial misconduct in closing argument. (Pen. Code, § 1181, subd. (5).) The prosecution argued that Guerrero's cross-examination testimony supported a reasonable inference that Hopkins had identified defendants at the scene of the traffic stop. The trial court denied the motions. The court described the PowerPoint presentation as a series of "bullet points or talking points. One of those slides included the statement, 'Hopkins identified defendants.' . . . Before she got to the point where I think it flashed up on the screen, I looked at it. Once I saw it, I asked the jury to step outside. I asked Ms. Oehler to either take down the slide or edit it because my recollection of the testimony was that Hopkins testified as to the circumstances surrounding the robbery by way of . . . his . . . 911 call. He did not testify as to the in-field identification, specifically of identifying these two defendants."

The trial court also stated: "In any event, what I find most compelling about this particular case is this: . . . There [are] . . . three victims . . . [and] the two defendants were identified as part of the two other counts. It all happened in immediate proximity in time, it all happened in proximity in location. There were police officers that actually testified

9

as to the actual stop and arrest, which included the incriminating evidence, I think it was a wallet, and there was a badge, a weapon, also I think if I remember correctly, there was a bullet proof vest as well. [¶] In any event, I find specifically that there is . . . enough evidence . . . as to those two other counts. In a vacuum, if that was the only count, counsel, Ms. McDaniel and Ms. Sims, your argument would be more well-taken. But there was . . . a wealth of other incriminating items of evidence which suggested the guilt of these two individuals. And so I am not inclined to grant the motion for new trial based on the alleged incidents of prosecutorial misconduct."

Defendants timely appealed.

## DISCUSSION

### I

Soto contends there is insufficient evidence to sustain his conviction of the Hopkins robbery and the firearm use enhancement for that count. We disagree.

In deciding this issue, we review the entire record and draw all reasonable inferences in favor of the judgment. If the record contains evidence from which a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt, the judgment must be affirmed. (*People v. Hughes* (2002) 27 Cal.4th 287, 370.)

The eyewitness identification testimony by Rodas and Alvarado was buttressed by strong circumstantial evidence. The vehicle license plate provided by Rodas closely matched that of the Ford Escape in which defendants were stopped shortly after the crimes were committed and in the same vicinity of the crimes. The vehicle in which defendants were riding contained personal items that had been stolen from two of the victims. Also found in the vehicle were a loaded handgun, bullet proof vest, and badge, which matched the description provided by the victims, including Hopkins in his 911 call. In light of the strong circumstantial evidence and eyewitness identification testimony of the first and third victims, we conclude that Soto's conviction of the Hopkins robbery is supported by substantial evidence.

10

As to the firearm use enhancement, the jury's finding also is supported by substantial evidence. Hopkins stated in the 911 call that a gun was put to his head. In addition, because the robberies of Hopkins and Rodas occurred in quick succession, we conclude for the reasons discussed below that the jury was entitled to apply the same eyewitness testimony by Rodas to determine both counts.

**II**

Defendants argue the prosecutor committed prejudicial misconduct during closing argument by referring to a matter not in evidence, that Hopkins had identified them. We disagree.[5]

The trial court found the disputed slide regarding the identification by Hopkins was *not* shown or read to the jury. On that point, for which there is no evidence to the contrary, we defer to the trial court's factual finding. Although counsel for Corona argued the slide containing the disputed item 12 *was* shown to the jury ("At the same time that I saw it, the court saw it, which suggests also that the jury saw it . . ."), the court resolved the dispute based on its own percipient observations. As the trial court was entitled to resolve this factual issue, we conclude the contention that the slide containing item 12 constituted improper argument is not meritorious.

Defendants argue the prosecutor made improper references in her closing argument to field identifications made by Hopkins. The record shows, however, that she was referring to reasonable inferences that could be drawn from Guerrero's cross-examination testimony, which was admitted without objection. "Failure to timely and specifically object is deemed a waiver (Evid. Code, § 353), which precludes raising the alleged misconduct on appeal." (*People v. Simon* (1989) 208 Cal.App.3d 841, 849, fn. omitted; see Evid. Code, § 353 [reversal for erroneous admission of evidence is improper where no objection was made below].)

_____

[5] In light of our determination that the prosecutor did not commit misconduct, the motion for new trial based on that purported misconduct was properly denied.

11

We conclude that Guerrero's cross-examination testimony supported a reasonable inference that field identifications had been made by Hopkins. Even if that were not the case, the record contains overwhelming evidence of defendants' guilt as to all three counts. Because all three robberies involved a high degree of similarity, the evidence strongly indicated the crimes were committed by the same individuals. "The 'highest degree of similarity is required to prove identity.' [Citation.] '"For identity to be established, the . . . common features [must be] sufficiently distinctive so as to support the inference that the same person committed both acts. [Citation.] 'The pattern and characteristics of the crimes must be so unusual and distinctive as to be like a signature.'"' [Citation.] 'The strength of the inference in any case depends upon two factors: (1) the *degree of distinctiveness* of individual shared marks, and (2) the *number* of minimally distinctive shared marks.' [Citation.] 'The inference of identity, however, "need not depend on one or more unique or nearly unique common features; features of substantial but lesser distinctiveness may yield a distinctive combination when considered together."' [Citation.]" (*People v. Edwards* (2013) 57 Cal.4th 658, 711.)

These three robberies were strikingly similar. During a 30-minute period, three men were robbed in the same general vicinity by two male Hispanics in a gray SUV, who used a gun, a badge, and a vest to impersonate police. The jury was entitled to infer that all three crimes were committed by defendants. Because the prosecutor's arguments were based on inferences reasonably drawn from the evidence, there was no misconduct. (*People v. Ward* (2005) 36 Cal.4th 186, 215 [prosecutor's argument may be vigorous provided it amounts to fair comment on evidence].)

## DISPOSITION

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

EPSTEIN, P. J.

We concur:

MANELLA, J.

COLLINS, J.

13